UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

―――――――――――――――――――――――――――――――――――――――――――――

CARA CALLIES,

       Plaintiff,

  v.                                  Case No. 24-CV-1264
                                         Demand For A Jury Trial

FISERV INC.,

       Defendant.

―――――――――――――――――――――――――――――――――――――――――――――

## COMPLAINT
―――――――――――――――――――――――――――――――――――――――――――――

Plaintiff Cara A. Callies ("Callies") or "Plaintiff" or brings this complaint against Defendant Fiserv Inc. ("Fiserv" or "Defendant") and states as follows:

## INTRODUCTION

1.    This is a civil action seeking equitable relief, compensatory, punitive and liquidated damages and attorney's fees pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e et seq. ("Title VII"), the Age Discrimination of Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA"), and the Americans with Disabilities Act 42 U.S.C. §§ 12181 et seq. ("ADA") for Defendant's adverse employment actions and ultimate termination for reasons of the Plaintiff's sex, age, disability, and in retaliation for the Plaintiff's assertion of rights under the above statutes.

## JURISDICTION

2.    This Court has subject matter jurisdiction under 29 U.S.C. § 216(b), 28 U.S.C. § 1331 because Plaintiff alleges violations of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e et seq. ("Title VII"), the Age Discrimination of Employment Act

of 1967, 29 U.S.C. § 621 et seq. ("ADEA"), and the Americans with Disabilities Act 42 U.S.C. §§ 12181 et seq. ("ADA").

3. This Court has supplemental jurisdiction over all other claims pursuant to 28 U.S.C. § 1367 because all other such claims arise in and are so related that they form part of the same case or controversy as the aforementioned claims.

4. Named Plaintiff has complied with all jurisdictional prerequisites to action under Title VII and the ADEA by timely filing a charge of discrimination with the Wisconsin Department of Workforce Development and receiving a probable cause determination on May 19, 2023. Plaintiff received a right to sue from Employment Opportunity Commission on July 11, 2024, a copy of which is attached hereto as Exhibit A.

5. The Court has personal jurisdiction over Defendant given that it operates within the State of Wisconsin, including within this judicial district.

6. Venue in this judicial district is proper by virtue of 28 U.S.C. § 1391(b) in that the alleged acts were committed in the Eastern District of Wisconsin, Plaintiff worked for Defendant in the Eastern District of Wisconsin and Defendant does business in the Eastern District of Wisconsin.

**PARTIES**

7. Plaintiff Cara Callies is an adult female, over 40 years of age residing in Port Washington, Wisconsin. She was formerly employed by Defendant, Fiserv.

8. Defendant Fiserv is a corporation with its principal office located in Wisconsin at 255 Fiserv Dr., Brookfield, Wisconsin, 53045. At all times relevant to this Complaint, Defendant engaged in interstate commerce and employed over 20 employees in the state of Wisconsin.

2

## FACTUAL BACKGROUND

9.      On or about December 16, 2019, Callies began working Fiserv as a Business Consultant.

10.     As a Business Consultant, Callies worked with vendors and financial institutions to facilitate the vendors ability to perform financial transactions with customers, utilizing Fiserv technology. Callies was compensated in-part on a commission basis relating to the number of vendors to which she sold Fiserv technology.

11.     Callies compensation was partially based on commission, relating to the number of vendor clients to whom she sold Fiserv technology products.

12.     Beginning in December 2021 and for all relevant periods of this Complaint, Greg Dunbar ("Dunbar") worked as Sales Director at Fiserv and acted as Callies' direct supervisor. In his position Dunbar is an agent of Fiserv. Dunbar supervised Callies and other Fiserv Business Consultants based in the mid-western region.

13.     Upon information and belief, Dunbar was at all times relevant to this complaint, under 40 years old.

14.     During the majority of Dunbar's supervision of Callies, she was the oldest employee reporting to him.

### CALLIES' AND DUNBAR'S WORKING RELATIONSHIP

15.     Quickly after Dunbar took over as Callies' supervisor, she noticed that he treated her differently than her co-workers.

16.     Soon after Dunbar became Callies' boss, he emailed her while she was on approved paid time off to instruct her of his expectations that she work despite being on vacation.

3

17.     On or about December 9 2021, Dunbar gave Callies incorrect information regarding the billing rate of a new client.

18.     Specifically, Dunbar informed Callies that a client was to be billed twenty-five percent (25%) above the interchange rate, which would be a rate that under Fiserv internal policies requires a management level employee above Dunbar to approve.

19.     Callies became concerned that Dunbar had given her incorrect information regarding the value of one of her sales.

20.     As Callies' salary was partially based on the monetary value of the sales she completes, Dunbar's incorrect information would artificially lower her salary and the metrics by which Fiserv evaluated its employees.

21.     Also in December, 2021, Dunbar also informed Callies that she must deduct 60 miles of her driving distance per day when she submitted a milage reimbursement request to Fiserv.

22.     On December 27, 2021, Callies made a complaint to Sheila Dehdashti ("Dehdashti"), the VP, Human Resources, about Dunbar. Callies related to Dehdashti that she believed Dunbar's directive on milage was incorrect.

23.     On January 31, 2022, after making a complaint to Dehdashti relating to milage, Callies learned from her male coworkers that they were not deducting 60 miles of their driving distance from their milage reimbursement requests.

24.     On the same day, Callies submitted a reimbursement request to Fiserv without deducting 60 miles from her driving distance.

25.     Soon after Callies submitted her milage reimbursement request, Callies received a response from Dunbar relating to a previous reimbursement request she made

4

based on purchasing personal protective equipment to use during her in-person meetings with vendors and financial institutions. Dunbar instructed Callies to deduct $105.43 from her request.

26. Callies later resubmitted her request for $105.43 in reimbursement and it was approved after multiple weeks of processing.

27. On February 2, 2022, Callies again contacted Dehdashti reporting her belief that Dunbar acted harassingly towards her on the basis of her sex.

28. Callies also became concerned that Fiserv was excercising a pattern of pushing out older employees in favor of younger employees.

<u>FISERV'S COVID-19 DIRECTIVES</u>

29. On January 22, 2022, Callies contracted Covid-19. Fiserv required Callies, per the Employer's written policies entitled Fiserv Safety Protocol, to quarantine away from all Fiserv associates, Fiserv controlled space, and client meetings for a minimum of 10 days.

30. Callies was told she could return to work upon receiving a negative PCR test or a doctor's note clearing her no sooner than the 11th day after she received her positive Covid-19 test. During the period of Callies quarantine, Dunbar instructed her to meet with the financial institutions she worked with virtually.

31. On Friday January 21, 2022, she informed Dunbar that she had a positive Covid-19 test.

32. The following day, Dunbar asked her about when she was returning to work, despite Fiserv's 10-day quarantine being written and available to all employees.

33.     Dunbar then repeatedly asked Callies about getting tested and told her to find an at home test, even though protocol at Fiserv was a PCR test, that could only be performed at a testing facility because the results had to be read in a lab.

34.     Upon information and belief, another male employee had also contracted Covid-19 shortly before and did not receive the same treatment despite the fact the same policy was in effect.

35.     Callies understood that while Fiserv emphasized in-person meetings, virtual meetings were acceptable during extenuating circumstances.

<u>FISERV SPONSORED MILWAUKEE BUCKS OUTING</u>

36.     On or about April 15, 2022, Callies received an email from Fiserv's Events Manager, informing her that Fiserv was making tickets to an upcoming Milwaukee Bucks playoff basketball game available to two of Callies' longstanding financial institution partners.

37.     When Fiserv hosts vendor clients or financial institutions at community events, one or more Fiserv employees attend as host. Generally, it is the employee who holds the primary working relationship with the clients or financial institution who hosts those parties at the event.

38.     As Callies' held the primary working relationship with both financial institution's involved, she inquired to Fiserv when she would be receiving a ticket and who else would be attending as a host.

39.     Instead of receiving a ticket, Dunbar called Callies and informed her that he would be hosting the financial institution partners instead of her.

40.     As justification, Dunbar stated that an existing working relationship was important for whoever attended the Bucks game, despite Callies' having the primary working relationship with the financial institutions involved.

41.     Dunbar then informed Callies that he would be bringing another employee who had no working relationship with the relevant financial institutions to the game, completely undercutting his previous justification.

42.     The employee Dunbar opted to bring was much younger than Callies (under 40-years old) and upon information and belief, lived and worked over 120 miles from downtown Milwaukee.

43.     Callies on the other had lived and worked within 25 miles of Fiserv Forum, where the Bucks play.

44.     After learning she would not be attending the Bucks game, Callies was contacted by a representative of the financial institution offered Bucks tickets. The financial institution representative, having a longstanding working relationship with Callies, inquired about the Bucks game and why Callies had not reached out about attendance.

45.     Callies informed the financial institution representative that she would not be going to the representatives surprise.

46.     Soon after, Dunbar contacted Callies and asked what the best way to contact the financial institution would be, evincing his lack of relationship with them as compared to Callies.

47.     Callies believes that Dunbar chose to attend the Bucks game and bring an under-40 co-worker instead of Callies based on her age.

7

<u>CALLIES' MEDICAL LEAVE</u>

48.     In early March 2022, Callies sustained a knee injury that ultimately required surgery, which she underwent on or around April 28, 2022.

49.     After her surgery, Callies' doctor prescribed work restrictions, limiting her to working only 2 to 8 hours a day for up to 12 weeks and restricting her from driving until May 17, 2022.

50.     Callies took leave under the Family Medical Leave Act on or around April 28, 2022, and further requested from Fiserv the accommodation of temporary reduced driving requirements.

51.     Callies was denied the accommodation of temporary reduced driving on May 8, 2022. In its denial, Fiserv stated that it could not accommodate Callies because driving was an essential function of her job.

52.     Fiserv reached the decision to deny Callies her request without asking for more information, or otherwise working with Callies to find an acceptable work-accommodation.

53.     Callies returned to full-time work after her surgery in mid to late May.

54.     At the time Callies returned to work Fiserv manager Chris Rodriguez ("Rodriguez") told other employees that the Employer expectation was to garner 10 approvals from clients each month.

55.     Upon information and belief, other Fiserv employees who had taken FMLA were placed on a corrective action for "trending down" in their sales. Callies feared that she would be penalized by Fiserv for taking FMLA, and for having an injury.

56.     Fiserv did not make any exceptions for Callies in its expectation for 10 new accounts in the month, although she had been on qualified FMLA leave based on her injury for a portion of May, 2024.

57.     In fact, Fiserv Vice President, Joe Wilhem ("Wilhelm") also emailed employes, seemingly encouraging them to work over the weekend and the Memorial Day Holiday in order to reach the 10-account goal.

58.     In response, Callies did work over the weekend and on Memorial Day.

59.     On May 31, 2022, Fiserv Human Resources representative Dehdashti informed Callies that she was separating from employment and that Aaron Witkowski ("Witkowski") would be taking over her place as Human Resources representative.

60.     On June 3rd, 2022 Callies complained to HR regarding her belief that Fiserv was treating her discriminatorily based on her disability (leg) and her request for accommodation.

61.     On June 9th, 2022 Callies raised to Witkowki her belief that Fiserv was discriminating against older workers, including herself, in favor of hiring younger workers and in favor of male workers.

62.     On June 10, 2022, Witkowski forwarded an email from Callies to Nichols, Dunbar, and Rodriguez, which included her references to issues with management.

63.     On June 12th, 2022 Calllies raised to Witkowski her belief that she was being discriminated against due to her disability and her age.

FURTHER DISCRIMINATORY TREATMENT AND INVESTIGATION INTO CALLIES

64.     During March 2022, Callies discovered that within Fiserv's internal client organizing system, several of her clients de-coupled from her and instead assigned the generic "BSC Digital QueueUser."

65.     Other Business Associates could attempt to sell to unassigned or generically assigned clients, gaining commission from those sales.

66.     Callies believed the only way her clients were to be re-assigned to a generic employee was by a supervisor at Fiserv altering the clients' information.

67.     Callies originally brought the issue of the 18 accounts to Dunbar on March 24, 2022.

68.     The issue remained unresolved, and on May 2, 2022, Callies also brought the issue to Tasha Nichols ("Nichols"), the VP of Boarding Solutions.

69.     On August 5, 2022, the issue remained unresolved, and Callies brought the issue to Joseph Wilhelm, VP and General Manager of community Financial Institutions.

70.     Upon information and belief, one of Callies' male co-workers who was also affected by this accounts error but was able to get his assigned back to him.

71.     On or around June, 2022, Callies began looking into other positions at Fiserv outside of Dunbar's supervision.

72.     On or about June 7, 2022, Susan Peterson ("Peterson"), a representative from Fiserv HR, contacted Callies regarding a lateral position within Fiserv to which Callies could apply. Callies applied for the position.

73.     Callies believed the lateral position was essentially the same position that Callies currently held with the exception that she would not travel.

10

74. Peterson informed Callies that she needed to inform her current manager (Dunbar) prior to potentially interviewing with the hiring manager of a lateral position. Based on this information, Callies contacted Witkowski stating that she feared retaliation from Dunbar should she have to inform him that she applied for other positions.

75. Rather than contact Dunbar, based on Callies' concerns of discrimination and retaliation against her, Witkowski informed Callies she could contact a different management representative about her lateral position application.

76. Callies' interview for the lateral position finally took place on June 14, 2022.

77. Callies did not receive a job offer regarding her lateral position application. Indeed, no representative of Fiserv followed up with Callies to inform her that she did not receive the position.

78. Throughout June and July Callies provided Human Resources, including Witkowski specifically, with additional information regarding her belief that Dunbar was acting discriminatorily towards her based on several factors, including her gender, her age, and her disability.

79. At each turn, Fiserv representatives informed her they would investigate her complaints, but no action was ever taken that remediated Callies' concerns. Rather, Fiserv informed Callies that it determined her complaints to be unsubstantiated.

80. On July 25, 2022, Callies informed Witkowski that she had further complaints that she would bring to him soon, relating to her treatment by Dunbar.

81. Based upon the dismissive treatment she felt she received from HR to that point, Callies believed additional evidence of Dunbar's actions would again fall on deaf ears.

82.    On July 27, 2022, Witkowski responded to that while Fiserv determined her past complaints could not be substantiated, he would consider any further information she had regarding her complaints.

83.    On the same day, July 27, 2022, an "Alertline" (an internal Fiserv alert noting policy violation or other ethical issue) was reported to Fiserv against Callies for alleged "churning."

84.    "Churning" within the Fiserv business is the improper action of a Business Associate creating multiple client accounts unnecessarily, thus artificially increasing the number of clients assigned to them and garnering inflated commission based on Fiserv's incentive pay scheme.

85.    Specifically, Fiserv instructs its sales agents to only create "new" client accounts where there is a legitimate reason to do so.

86.    Fiserv describes a change in business ownership as a legitimate reason to create a new client account.

87.    Each time a new client is created, the Fiserv employee who creates the client would receive a slight commission for the following three years. The commission is minimal, around $5.00 per new client account.

88.    Throughout the spring and summer 2022, Callies worked with a vendor client interested in opening a restaurant. During their working relationship, the client changed the business ownership and corporate structure several times. Each time the client changed their business ownership and/or corporate structure, Callies created a "new" client account for them to reflect the change.

12

89.     Specifically, Callies first had difficulty setting up the new account due to confusion and a mistake on her part as to who, individually, owned the restaurant.

90.     After Callies learned the true ownership, she set up the business, which happened to be a limited liability company, with a new account. Fiserv approved the new account.

91.     Soon after Fiserv approved the account, Callies was contacted by the restaurant owner who informed Callies he intended to change his business' corporate structure to bring on his brother and become incorporated.

92.     Callies responded by making a creating a new account for the newly incorporated restaurant, which had different ownership and a different tax identification number as the limited liability company.

93.     Fiserv approved the new account for the incorporated restaurant.

94.     Over a month later, in July, 2022, Callies was contacted again by the restaurant owner and informed that due to personal reasons between the brothers, the corporation had to be dissolved and instead the restaurant owner would move forward as a sole proprietorship. Again, the business owner changed and the tax identification changed. Fiserv approved the sole proprietorship application on July 21, 2022.

95.     Callies did not attempt to hide or obfuscate her actions. She believed that a change in ownership or change in corporate structure were legitimate business reasons requiring a "new" client account creation.

96.     Callies contacted other employees, including Fiserv Underwriting Analysis Associate Devindra Signh ("Singh") as early as May 31, 2022 and Fiserv Client Service

specialist Dawn Gehner ("Gehner") throughout July, to ask for help dealing with the ownership changes made by the restaurant owner.

97. At Fiserv, commission pay is disbursed to the sales agent who signs up new business for three years after making the sale, so by creating a new account for the Company-Applicant a mere three months after closing the initial sale, Ms. Callies was only extending her commission disbursement schedule by three months.

98. In conjunction with the de minimis amount of commission she received on the account, Ms. Callies was at most set to receive $15 more than she would have received had the Company-Applicant not transitioned from LLC to Sole Proprietorship.

99. Callies created new accounts for the restaurant client within a three-month time period, meaning she would have garnered an increased commission based on her actions of about $15.00.

100. Callies did not create multiple client accounts for her restaurant client in order to receive any increased commission.

101. Callies was not informed of the Alertline until August 23, 2022, when Leon Lake ("Lake"), a Global Security and Investigations employee of Fiserv, contacted her via email.

102. In response to Lake's inquiries Callies provided ample evidence demonstrating that her behavior was not "churning" but rather the proper action according to Fiserv's instructions to its sales agents, and that Callies was not seeking any monetary benefit through her actions.

14

103. Callies provided email and documentary evidence that over the course of three months each new account opened for the Company-Applicant was predicated on a legitimate business entity change.

104. Callies also provided to Lake the names of multiple witnesses who could speak to her actions, yet Lake did not contact any of Callies' proposed witnesses.

105. While responding to Lake, Callies reiterated that Dunbar treated her differently than her colleagues, possibly on the basis of gender, age, and disability.

106. Callies specifically stated to Lake that Dunbar "doesn't speak like this to any of the other, younger team members that he manages."

107. One week later, on September 2, 2022, Fiserv terminated Callies' employment.

108. At the end of December 2021, on or around the time Dunbar was put in the management position, 47.5% of the members of Dunbar's team were over the age of 40. As of Callies' termination on September 2, 2022, there were no longer any sales associates over 40 on Dunbar's team.

109. From December 2021 until Callies' termination in September, 2022, she was targeted with adverse employment actions and harassment by her supervisor, Dunbar, for reasons of sex, age, and disability.

110. Callies made several clear complaints to Fiserv about the adverse employment actions and harassment she received, specifically putting Fiserv on notice of her belief that she was subject to mistreatment due to her sex, age, and disability.

111. Despite Callies' many pleas for assistance, Fiserv never took any action to help Callies.

112.    Immediately after Callies' informed Fiserv that she had further unlawful discrimination to report, Callies was investigated without basis and wrongfully terminated.

## COUNT I: DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

113.    Plaintiff realleges and incorporates by reference paragraphs 1 through 112 above.

114.    Defendant took adverse employment actions against Plaintiff on the basis of her sex, violating Title VII.

115.    Defendant subjected Plaintiff to a pattern of harassment on the basis of her sex, violating Title VII.

116.    Defendant terminated Plaintiff on the basis of her sex, violating Title VII.

117.    As a result of Defendant's discriminatory conduct as described herein, Plaintiff has suffered a loss of wages, mental duress and anguish, and is entitled to punitive and compensatory damages, attorney's fees, and any other equitable relief the court deems just.

## COUNT II: RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

118.    Plaintiff realleges and incorporates by reference paragraphs 1 through 117 above.

119.    Plaintiff Callies engaged in protected activity by complaining to Fiserv that its conduct violated Title VII by subjecting her to sex-based discrimination.

120.    Defendant terminated Plaintiff because of her complaints about sex-based discrimination.

121.   By terminating Plaintiff because of her complaints about sex-based discrimination, Fiserv engaged in intentional discrimination against Callies with malice or reckless indifference to her federally protected rights.

122.   The Defendant's conduct in terminating Plaintiff because of her complaints about age-based discrimination violated Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e(k) and §2000e-2(a).

123.   As a result of Defendant's discriminatory conduct as described herein, Plaintiff has suffered a loss of wages, mental duress and anguish, and is entitled to punitive and compensatory damages, attorney's fees, and any other equitable relief the court deems just.

**COUNT III: DISCRIMINATION IN VIOLATION OF THE AGE DISCRIMINATION OF EMPLOYMENT ACT OF 1967,  29 U.S.C. § 621 et seq.**

124.   Plaintiff realleges and incorporates by reference paragraphs 1 through 123 above.

125.   Defendant took adverse employment actions against Plaintiff on the basis of her age, violating the ADEA.

126.   Defendant subjected Plaintiff to a pattern of harassment on the basis of her age, violating ADEA.

127.   Defendant terminated Plaintiff on the basis of her age, violating ADEA.

128.   As a result of Defendant's discriminatory conduct as described herein, Plaintiff has suffered a loss of wages, mental duress and anguish, and is entitled to punitive and compensatory damages, attorney's fees, and any other equitable relief the court deems just.

17

**COUNT IV: RETALIATION IN VIOLATION OF THE AGE DISCRIMINATION OF EMPLOYMENT ACT OF 1967,  29 U.S.C. § 621 et seq.**

129.    Plaintiff realleges and incorporates by reference paragraphs 1 through 128 above.

130.    Plaintiff engaged in protected activity by complaining to Fiserv that its conduct violated the ADEA by subjecting her to age-based discrimination.

131.    Defendant terminated Plaintiff because of her complaints about age-based discrimination.

132.    By terminating Plaintiff because of her complaints about age-based discrimination, Fiserv engaged in intentional discrimination against Plaintiff with malice or reckless indifference to her federally protected rights.

133.    The Defendant's conduct in terminating Plaintiff because of her complaints about age-based discrimination violated the ADEA.

134.    As a result of Defendant's discriminatory conduct as described herein, Plaintiff has suffered a loss of wages, mental duress and anguish, and is entitled to punitive and compensatory damages, attorney's fees, and any other equitable relief the court deems just.

**COUNT V: DISCRIMINATION IN VIOLATION THE AMERICANS WITH DISABILITIES ACT 42 U.S.C. §§ 12181 et seq.**

135.    Plaintiff realleges and incorporates by reference paragraphs 1 through 134 above.

136.    Defendant took adverse employment actions against Plaintiff on the basis of her age, violating the ADA.

137. Defendant subjected Plaintiff to a pattern of harassment on the basis of her age, violating the ADA.

138. Defendant terminated Plaintiff on the basis of her age, violating the ADA.

139. As a result of Defendant's discriminatory conduct as described herein, Plaintiff has suffered a loss of wages, mental duress and anguish, and is entitled to punitive and compensatory damages, attorney's fees, and any other equitable relief the court deems just.

**COUNT VI: RETALIATION IN VIOLATION THE AMERICANS WITH DISABILITIES ACT 42 U.S.C. §§ 12181 et seq.**

140. Plaintiff realleges and incorporates by reference paragraphs 1 through 139 above.

141. Plaintiff engaged in protected activity by complaining to Fiserv that its conduct violated the ADA by subjecting her to disability-based discrimination.

142. Defendant terminated Plaintiff because of her complaints about disability-based discrimination.

143. By terminating Plaintiff because of her complaints about age-based discrimination, Fiserv engaged in intentional discrimination against Plaintiff with malice or reckless indifference to her federally protected rights.

144. The Defendant's conduct in terminating Plaintiff because of her complaints about age-based discrimination violated the ADA.

145. As a result of Defendant's discriminatory conduct as described herein, Plaintiff has suffered a loss of wages, mental duress and anguish, and is entitled to punitive and compensatory damages, attorney's fees, and any other equitable relief the court deems just.

**RELIEF**

**WHEREFORE,** the Plaintiff respectfully requests that this Court:

a.   Enter judgment that the Defendant violated Title VII of the Civil Rights Act of 1964 as amended.

b.   Enter judgment that the Defendant violated the Americans with Disabilities Act 42 U.S.C. §§ 12181 et seq.

c.   Enter judgment that the Defendant violated the Age Discrimination in Employment Act 29 U.S.C. §§ 601 et seq.;

d.   Enter judgment against the Defendant and in favor of the Plaintiff for monetary relief equal to the amount of wages, employment benefits, and other compensation, with interest, denied or lost by reason of the Defendant's unlawful facts;

e.   Order Defendant to reinstate Plaintiff to a position comparable to her former position or, in lieu of reinstatement, award her front pay (including benefits);

f.   Award Plaintiff the cost of this action and reasonable attorneys' fees; and

g.   Grant Plaintiff such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues of fact.

Dated this 4th day of October, 2024

s/Jill M. Hartley
Jill M. Hartley (State Bar No. 1027926)
Emma M. Woods (State Bar No. 1120187)
The Previant Law Firm, S.C.
310 West Wisconsin Avenue, Suite 100MW
Phone:  414-271-4500
Fax:      414-271-6308
jh@previant.com
emw@previant.com

*Attorneys for Cara Callies*